## JOHN W. CHERRY

*v.*

## CARTHAGE COLLEGE.

1. CONTRACT—*construction.* Where the locating committee of a proposed college required A, the owner of a tract of land near the proposed site of the college, to lay the same off into town lots, and give every eighth lot to the college as a condition to the selection of the proposed site, which he refused to do, until B & C, under a verbal agreement, purchased each a third interest of the land, including streets, alleys, and the lots demanded, at $200 per acre; and A, then with the consent of B & C, entered into a written agreement with the college to give the lots demanded, which turned out to be six lots; and which agreement provided that the college lots, when laid off, should be appraised and considered as a subscription of so much stock to be equally divided between A, B, and C, reserving to them, however, the right to keep the lots at their appraised value: *Held,* that the agreement, though executed by A alone, was, in fact, an agreement by him and B and C, to subscribe each two lots to the college, A giving two as belonging to himself, and two for each of the others as trustee, holding the legal title for them.

2. SUBSCRIPTION—*construction.* B and C, under a verbal agreement, purchased each an undivided third of a tract of land of A, after which, by the consent of all, A executed a written agreement to the Carthage College to lay off the land into an addition to the town of Carthage, and give every eighth lot to the college, upon condition that the buildings were located at a point near the land; which lots should be appraised and considered as a subscription to be equally divided between A, B, and C, reserving to them the option to pay the appraised value and keep the lots. The land was laid out into forty-eight lots, six of which the college was entitled to un-

der the agreement. Before their appraisement, B subscribed three shares, of $100 each, in these words : " B, three shares, including two lots, or cash in lieu thereof, at the option of said B." At the first election of trustees, B paid five per cent of his subscription to entitle him to vote, and A was allowed to vote six votes for the lots. The lots were afterward appraised, no two of them at less than $300, and sold by the college, A making deeds therefor to the purchaser. A having repudiated his verbal contract with B to sell him one-third interest in the land, the college brought suit against B to recover the balance of his subscription : *Held*, from the circumstances of the case and the similarity of the options reserved in the agreement of A and B's subscription, that the two lots subscribed by B were the two mentioned in the agreement of A ; that B's subscription was fully paid in the two lots he was entitled to under his verbal purchase of A, and which the college received ; and that the payment of five per cent by B before the lots were appraised, could not be held to be an election to pay his subscription in money.

WRIT OF ERROR to the Circuit Court of Hancock County ; the Hon. JOSEPH SIBLEY, Judge, presiding.

Messrs. MANIER, PETERSON, and MILLER, for the plaintiff in error.

Mr. H. W. DRAPER, for the defendant in error.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was an action brought upon a subscription to the capital stock of Carthage College.

The book of subscription in evidence, showed an agreement for subscription to the capital stock of the college of the number of shares, of $100 each, set after the subscriber's name, to which appears the appellant's subscription, in the following form :

" John W. Cherry, three shares, including two lots, or cash in lieu thereof, at the option of said Cherry."

We find it necessary to address ourselves to one only of the several questions raised, and that is, whether Cherry has complied with the alternative part of his subscription—to give two lots, as was contemplated in the making of the subscription.

Previous to the subscription, one George W. Carlton had executed to the locating committee of the college, his instrument in writing, under his hand and seal, whereby he agreed, in consideration of the location of the college where it now stands, to lay off a certain addition to the town of Carthage, and further agreed as follows: " I further agree to give said college, or to the joint stock company about to be formed for building said college, one-eighth of the lots when laid off, to be selected as follows, to-wit: said Carlton to have choice of the first seven lots wherever he may choose them, and the college company to have choice of the next two lots wherever they may select them, and so on through the whole number of said lots.

" This agreement is upon the express condition that the said college is permanently located as above stated. The college lots, when laid off, to be appraised and to be considered as subscription of so much stock to the joint stock company, to be equally divided between me and John W. Cherry and Oliver P. Carlton; and if said Carlton, John W. Cherry, and Oliver P. Carlton desire to do so, they are to have the privilege of taking the said college lots at their appraised value."

This agreement bears date January 8, 1870.

It was in evidence that a committee had been appointed to locate the site of the college, and had selected the ground of the present site, but refused to locate the college upon it unless one-eighth of the lots in Carlton's projected addition were subscribed; and that Geo. W. Carlton, who owned the land, refused to give the lots demanded of him; whereupon Cherry went to him and made an offer to give him two hundred dollars per acre for an undivided half interest in the land proposed to be laid off into lots, including the streets and alleys and the lots to be given to the college; and Oliver P. Carlton, who was present, expressing a willingness to take a third interest upon the same terms, George W. Carlton then said that if Cherry and Oliver P. Carlton would purchase and take, each, a third interest, he would accept the terms proposed by the college. A verbal agreement was then made between George W. Carlton, Cherry,

and Oliver P. Carlton, that the former should lay off the land into town lots and give the college every eighth lot; that the two latter were to have, each, one-third interest in the land, and pay George W. Carlton therefor at the rate of two hundred dollars per acre for the whole piece, including streets, alleys, and the lots going to the college; they were severally to pay one-third of the expense of laying off the lots, one-third of the purchase money when they divided the lots, and the remainder out of the first purchase money arising from the sale of their share of the lots. Oliver P. Carlton paid something toward the expense of laying off the lots, and nothing more, and, finding himself unable to pay for it, gave up his interest in the land.

Cherry never paid any thing toward the land, and, a short time before February 25, 1871, Carlton repudiated the verbal contract of sale to him.

The addition was laid off into forty-eight lots, so that the college became entitled to six. June 4, 1870, the six college lots were selected, and were appraised August 6, 1870, the appraisement of any two of them exceeding $300; and on the 25th day of February, 1871, they were all sold by the college, either two of them selling for more than $300.

After the college lots had been selected, the remaining ones were divided between George W. Carlton, John W. Cherry, and Oliver P. Carlton, they all being present and acting together in the division, and each one's name being marked on the lots taken by him, on the plat. George W. Carlton testified that he never would have executed the agreement of January 8, 1870, or have given the amount of lots named therein, but for the verbal contract made between himself, Cherry, and Oliver P. Carlton; that, by such contract, he was, in fact, giving but one-third of the lots named.

It appears, then, in the light of all the attending circumstances, that the agreement of January 8, 1870, of George W. Carlton, to give, what turned out to be six lots, to the college, was, in fact, an agreement by him and Cherry and Oliver P. Carlton to give, each, two lots to the college; that the agree-

ment was made in the name of George W. Carlton, as the legal title was in him, but that he should be regarded as the real owner of only one-third of the land and the lots agreed to be given; and that Cherry and Oliver P. Carlton were, each, the owner of one-third thereof, under a verbal contract of purchase; and that, in substance, Carlton's agreement was to give two lots for himself, as belonging to him, and, as trustee for Cherry and Oliver P. Carlton, to give two lots for each of them, as belonging to them.

Before Cherry made his subscription the addition had been laid off into forty-eight lots, and so it became known that the number of lots to be given for him, under the agreement of January 8, 1870, was two. When, then, he made the subscription in question of two lots, we are of opinion he referred to the two lots he had contracted for, and which had been agreed to be given for him in the name of George W. Carlton by the agreement of January 8, 1870, and that he did not intend to subscribe two lots in addition thereto, and that the subscription was in view of this clause in that agreement:

"The college lots when laid off to be appraised and to be considered as subscription of so much stock to the joint stock company, to be equally divided between me and John W. Cherry and Oliver P. Carlton."

A further evidence that the subscription was made with reference to the agreement, is the similarity of the option reserved in them. In the agreement it reads: "If said Carlton, John W. Cherry, and Oliver P. Carlton desire to do so, they are to have the privilege of taking said college lots at their appraised value." In the subscription it is: "three shares, including two lots, or cash in lieu thereof, at the option of said Cherry." And such must be taken to have been the understanding of the appellee, or of those acting in its behalf. The agreement of January 8, 1870, was executed to a locating committee of the college; H. W. Draper, its treasurer, and who had been connected with the college from the beginning, drew

up the agreement, and he had heard from Cherry that he was going to buy, or that he had bought, of Carlton an interest in the land. The college has got all the six lots. We think that is all they are entitled to, from both George W. Carlton and Cherry, under a fair construction of the subscription and the agreement of the former taken together, in connection with the circumstances, provided any two of the lots were equal in value to $300.

They being of a larger value, and the college having got the two lots contemplated by the subscription, it must be held to be discharged.

We do not regard the payment of five per cent of the subscription by Cherry an election on his part to pay his whole subscription in cash instead of the two lots, as is insisted upon by appellee's counsel. The amount was small; it was necessary to be paid at or before the first election of trustees; that took place March 5, 1870. Cherry might have been willing to pay that sum in order to participate in the election.

The college lots had not then been selected, and Cherry could not then have known at what price his lots would be appraised, or their value, and could not exercise his option to advantage. Again, quite probably it was not then expected that the two lots would pay for the three shares, the words of the subscription rather indicating that.

It is urged as a circumstance opposed to the view here taken, that at the first meeting for the election of trustees, Carlton voted six votes for the lots given under his agreement, and Cherry, at the same time, gave three votes on the amount of his subscription. This, it is true, is a fact tending to show that the subscription and Carlton's agreement of January 8, 1870, were independent of each other, but we do not regard it as a controlling fact in that direction. Cherry himself cast no more votes than he was entitled to.

It seems the motion was made that Carlton be allowed to vote for the lots given by him, and as the lots had not then been selected or valued, the question arose of how many votes he was entitled to, and that it was concluded the lots were

worth $600. When they come to be selected and appraised, they were appraised at $1,200. Carlton seemingly gave more votes than he was entitled to at the time, on the theory we have adopted. But the uncertainty of the value of the lots made it uncertain how many votes were entitled to be cast in respect to them; and, as the result showed, Carlton really cast no more votes than he was justly entitled to in respect to his own interest and that of Oliver P. Carlton. Had it appeared that Cherry had an interest that Carlton should not cast any greater number of votes than he was rightly entitled to, there would have been more force in this circumstance.

It is true that Cherry is admitted to pay his subscription very cheaply in lots he never paid any thing for. But the only just cause of complaint on that score is with Carlton.

The only question as respects the appellee is, whether it has got all that it is entitled to as contemplated by the subscription. Although no payment had been made, the lots contracted for by Cherry and Oliver P. Carlton must be taken as having been selected and turned over to the college, not as the lots of George W. Carlton, but as those of the two former, and as belonging to them by virtue of their verbal contract of purchase. It was something done on the part of George W. Carlton in part performance of the contract, and he afterward did further acts of part performance in the division of the remainder of the lots with Cherry and Oliver P. Carlton, and marking their names as owners on the lots on the plat which fell to their share in the division. The contract was treated by Carlton as valid and subsisting a short time before February 25, 1871, by applying to Cherry for payment of purchase money under it; and it was not until after this time that the contract was ever repudiated by George W. Carlton.

The judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*